1

**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo, Esq. (Bar No. 144074)

2

dalekgalipo@yahoo.com
21800 Burbank Boulevard, Suite 310

3

Woodland Hills, California 91367
Tel:   (818) 347-3333

4

Fax:   (818) 347-4118

5

Attorneys for Plaintiff

6

7

8

9

10

**UNITED STATES DISTRICT COURT**

11

**EASTERN DISTRICT OF CALIFORNIA**

12

13

MARGARITA LOPEZ SANCHEZ,

14

                    Plaintiff,

15

         vs.

16

17

JEFFREY MACOMBER; JENNIFER
BARRETTO; DAVID LEWIS;

18

BRANTLEY CHOATE; CONNIE
GIPSON; RON DAVIS; DERRICK

19

MARION; WILLIE DOBIE III;
JEFFREY LYNCH; N. COLLINS;

20

CHRISTIE ANGULO; L. HERRERA; Y.
ARNOLD; YVETTE CASTILLO; DOE

21

PONCE; and DOES 1 through 10,
inclusive each individually,

22

23

                    Defendants.

24

25

26

27

28

Case No. 2:23-cv-01011-MCE-AC

**FIRST AMENDED COMPLAINT
FOR DAMAGES**

[*Honorable Morrison C. England, Jr.*]

Pursuant to 42 U.S.C. §1983
  1.  Failure to Protect – Violation of
      the Eighth Amendment
  2.  Denial of Familial Relationship,
      Due Process – Violation of the
      Fourteenth Amendment

Pursuant to State Law
  3.  Negligence

**DEMAND FOR JURY TRIAL**

## FIRST AMENDED COMPLAINT FOR DAMAGES

COME NOW Plaintiff MARGARITA LOPEZ SANCHEZ for her Complaint against Defendants JEFFREY MACOMBER; JENNIFER BARRETTO; DAVID LEWIS; BRANTLEY CHOATE; CONNIE GIPSON; RON DAVIS; DERRICK MARION; WILLIE DOBIE III; JEFFREY LYNCH; N. COLLINS; CHRISIE ANGULO; L. HERRERA; Y. ARNOLD; YVETTE CASTILLO; DOE PONCE; and DOES 1 through 10, inclusive each individually, alleging as follows:

## INTRODUCTION

1.      This civil rights action arises out of the May 6, 2022, tragic and preventable death of Plaintiff's son, CAMILO BANOSLOPEZ ("Decedent"), which was a consequence of a negligent and deliberate failure to provide protection by the Defendants JEFFREY MACOMBER; JENNIFER BARRETTO; DAVID LEWIS; BRANTLEY CHOATE; CONNIE GIPSON; RON DAVIS; DERRICK MARION; WILLIE DOBIE III; and JEFFREY LYNCH (together called "Supervisor Defendants"); and N. COLLINS; CHRISIE ANGULO; L. HERRERA; Y. ARNOLD; YVETTE CASTILLO; DOE PONCE; and DOES 1-5 (together called "Classification Officers"); and Defendant DOES 6-10 (together called "Correctional Officers"), each individually.

2.      Defendants failed to protect Decedent, placing him in a perilous situation and exposing him to the known and substantial risk of harm by other inmates. Consequently, this negligence and lack of protection caused and allowed four (4) inmates, identified as Albert Calvillo, Irvin Rodriguez, Osbaldo Velasquez, and Jose Avila (together called "Assailants"), to brutally attack and kill Decedent.

3.      Decedent's mother, Plaintiff, seeks compensatory damages, punitive damages, attorneys' fees, and costs from the Individual Defendants for violating her and Decedent's rights guaranteed under federal and state law. Plaintiff also brings a negligence claim under California state law against Defendants.

4.     Defendants are directly liable for their nonfeasance and malfeasance and for Decedent's and Plaintiff's injuries, harm, and damages under federal law pursuant to 42 U.S.C. §1983 and under state law pursuant to Cal. Govt. Code §§820, 820.4, 820.8, and 821.8, and Cal. Code. of Civ. Pro. §§377.20, 377.30, 377.34, 377.60, 377.61, and 1021.5. The State of California, through California Department of Corrections and Rehabilitation ("CDCR") and California State Prison Sacramento ("CSP-SAC"), are vicariously liable for the acts and omissions and for the nonfeasance and malfeasance of each Defendant pursuant to Cal. Govt. Code §§820(a), 815.2(a), and 815.6.

## JURISDICTION AND VENUE

5.     This Court has original jurisdiction pursuant to 28 U.S.C. §§1331 and 1343(a)(3)-(4) because Plaintiff asserts claims arising under the laws of the United States including 42 U.S.C. §1983 and the Eighth and Fourteenth Amendments of the United States Constitution. This Court has supplemental jurisdiction over Plaintiff's claims arising under state law pursuant to 28 U.S.C. §1367(a), because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

6.     Venue is proper in this Court under 28 U.S.C. § 391(b) because Defendants reside in this district and all incidents, events, and occurrences giving rise to this action occurred in this district.

## PARTIES

7.     CAMILO BANOSLOPEZ ("Decedent"), born May 20, 1999, died on May 6, 2022, at merely 22 years' old, while in the custody and under the protection of the Defendant Supervisors, Classification Officers, and Correctional Officers at CDCR and CSP-SAC, in Folsom, Sacramento County, California. At the time of this incident, Decedent was housed within CSP-SAC.

8.     Plaintiff MARGARITA LOPEZ SANCHEZ ("Plaintiff") is an individual residing in the City of Glendora, California and is the mother of

Decedent. Plaintiff sues in her individual capacity for compensatory damages under state and federal law, and for survival damages as Decedent's successor-in-interest pursuant to California Code of Civil Procedure §§ 377.30 and 377.60.

9.      In his individual capacity, at all relevant times, Defendant JEFFREY MACOMBER ("Macomber"), Secretary of CDCR, appointed by Governor Gavin Newsom, was and is a duly appointed State official and/or agent through CDCR and CSP-SAC, with the direct responsibility to operate, administer, and manage all state-operated adult prisons, including CDCR and CSP-SAC, subject to the oversight and supervision of the State of California, CDCR, and CSP-SAC'S elected and non-elected officials. Macomber was and is fully aware of the negligent operation and security of CDCR and specifically CSP-SAC, given his three decades of experience including Correctional Officer, various roles at CDCR Headquarters, Correctional Business Manager at Richard A. McGee Correctional Training Center, Chief of the Program Support Unit and Transportation Unit, CSP-SAC Correctional Administrator, CSP-SAC Chief Deputy Warden, CSP-SAC Warden, Deputy Director of Facility Support in the Division of Adult Institutions, Director of Corrections Services for California Correctional Health Care Services, Undersecretary of Administration, and Undersecretary of Operations. Defendant Macomber was at all relevant times responsible for devising and implementing security and safety policies, procedures, and training for the safe housing, classification, escorting, protecting, and monitoring of inmates as well as all policies, procedures, and training for preventing, and responding to inmate-on-inmate attacks, violence, and disturbances. Defendant Macomber was and is directly responsible for the supervision, training, hiring, retention, discipline, and conduct of each and every individual Defendant. Specifically, Defendant Macomber was and is responsible for the improper organization of inmate housing at CSP-SAC, the improper classification of inmates at CSP-SAC, the improper security and reaction to violence of inmates at CSP-SAC, and the improper customs and practices for the

movement of inmates at CSP-SAC. At all relevant times, Defendant Macomber acted under color of law, to wit, under the color of the statutes, ordinances, regulations, policies, customs, and usages of the State of California, CDCR, and CSP-SAC and under the color of the statutes and regulations of the State of California. On information and belief, Defendant Macomber is and was at all relevant times a resident of this judicial district.

10.   In her individual capacity, at all relevant times, Defendant JENNIFER BARRETTO ("Barretto") was a duly appointed Undersecretary of Administration of CDCR and CSP-SAC, previously Deputy Director and Facility Support for Division of Adult Institutions, and previously Chief Deputy Administrator of Correctional Programs, with the direct responsibility to operate, administer, and manage all state-operated adult prisons, including CDCR and CSP-SAC, subject to the oversight and supervision of the State of California, CDCR, and CSP-SAC's elected and non-elected officials. Defendant Barretto was at all relevant times responsible for devising and implementing security and safety policies, procedures, and training for the safe housing, classification, escorting, protecting, and monitoring of inmates as well as all policies, procedures, and training for preventing, and responding to inmate-on-inmate attacks, violence, and disturbances. Defendant Barretto was and is directly responsible for the supervision, training, hiring, retention, discipline, and conduct of the Individual Defendants. Specifically, Defendant Barretto was and is responsible for the improper organization of inmate housing at CSP-SAC, the improper classification of inmates at CSP-SAC, the improper security and reaction to violence of inmates at CSP-SAC, and the improper customs and practices for the movement of inmates at CSP-SAC. At all relevant times, Defendant Barretto acted under color of law, under the statutes and regulations of the State of California. On information and belief, Defendant Barretto is and was at all relevant times a resident of this judicial district.

11.     In his individual capacity, at all relevant times, Defendant DAVID LEWIS ("Lewis"), was a duly appointed Directory of the Division of Facility Planning, Construction and Management, of CDCR and CSP-SAC, with the direct responsibility to operate, administer, and manage all state-operated adult prisons, including CDCR and CSP-SAC, subject to the oversight and supervision of the State of California, CDCR, and CSP-SAC'S elected and non-elected officials. Defendant Lewis was at all relevant times responsible for devising and implementing security and safety policies, procedures, and training for the safe housing, classification, escorting, protecting, and monitoring of inmates as well as all policies, procedures, and training for preventing, and responding to inmate-on-inmate attacks, violence, and disturbances. Defendant Lewis was and is directly responsible for the supervision, training, hiring, retention, discipline, and conduct of the Individual Defendants. Specifically, Defendant Lewis was and is responsible for the improper organization of inmate housing at CSP-SAC, the improper classification of inmates at CSP-SAC, the improper security and reaction to violence of inmates at CSP-SAC, and the improper customs and practices for the movement of inmates at CSP-SAC. At all relevant times, Defendant Lewis acted under color of law, to wit, under the color of the statutes, ordinances, regulations, policies, customs, and usages of the State of California, CDCR, and CSP-SAC and under the color of the statutes and regulations of the State of California. On information and belief, Defendant Lewis is and was at all relevant times a resident of this judicial district.

12.     In his individual capacity, at all relevant times, Defendant BRANTLEY CHOATE ("Choate") was a duly appointed Director – Division of Rehabilitative Programs of CDCR and CSP-SAC, with the direct responsibility to operate, administer, and manage all state-operated adult prisons, including CDCR and CSP-SAC, subject to the oversight and supervision of the State of California, CDCR, and CSP-SAC's elected and non-elected officials. Defendant Choate was at all relevant times responsible for devising and implementing security and safety policies,

procedures, and training for the safe housing, classification, escorting, protecting, and monitoring of inmates as well as all policies, procedures, and training for preventing, and responding to inmate-on-inmate attacks, violence, and disturbances. Defendant Choate was and is directly responsible for the supervision, training, hiring, retention, discipline, and conduct of the Individual Defendants. Specifically, Defendant Choate was and is responsible for the improper organization of inmate housing at CSP-SAC, the improper classification of inmates at CSP-SAC, the improper security and reaction to violence of inmates at CSP-SAC, and the improper customs and practices for the movement of inmates at CSP-SAC. At all relevant times, Defendant Choate acted under color of law, to wit, under the color of the statutes, ordinances, regulations, policies, customs, and usages of the State of California, CDCR, and CSP-SAC and under the color of the statutes and regulations of the State of California. On information and belief, Defendant Choate is and was at all relevant times a resident of this judicial district.

13.    In her individual capacity, at all relevant times, Defendant CONNIE GIPSON ("Gibson") was a duly appointed Director – Division of Adult Institutions of CDCR and CSP-SAC, with the direct responsibility to operate, administer, and manage all state-operated adult prisons, including CDCR and CSP-SAC, subject to the oversight and supervision of the State of California, CDCR, and CSP-SAC'S elected and non-elected officials. Defendant Gibson was at all relevant times responsible for devising and implementing security and safety policies, procedures, and training for the safe housing, classification, escorting, protecting, and monitoring of inmates as well as all policies, procedures, and training for preventing, and responding to inmate-on-inmate attacks, violence, and disturbances. Defendant Gibson was and is directly responsible for the supervision, training, hiring, retention, discipline, and conduct of the Individual Defendants. Specifically, Defendant Gibson was and is responsible for the improper organization of inmate housing at CSP-SAC, the improper classification of inmates at CSP-SAC, the

improper security and reaction to violence of inmates at CSP-SAC, and the improper customs and practices for the movement of inmates at CSP-SAC. At all relevant times, Defendant Gibson acted under color of law, to wit, under the color of the statutes, ordinances, regulations, policies, customs, and usages of the State of California, CDCR, and CSP-SAC and under the color of the statutes and regulations of the State of California. On information and belief, Defendant Gibson is and was at all relevant times a resident of this judicial district.

14.     In his individual capacity, at all relevant times, Defendant RON DAVIS ("Davis") was a duly appointed Acting Deputy Director, Facility Operations – Division of Adult Institutions of CDCR and CSP-SAC, with the direct responsibility to operate, administer, and manage all state-operated adult prisons, including CDCR and CSP-SAC, subject to the oversight and supervision of the State of California, CDCR, and CSP-SAC's elected and non-elected officials. Defendant Davis was at all relevant times responsible for devising and implementing security and safety policies, procedures, and training for the safe housing, classification, escorting, protecting, and monitoring of inmates as well as all policies, procedures, and training for preventing, and responding to inmate-on-inmate attacks, violence, and disturbances. Defendant Davis was and is directly responsible for the supervision, training, hiring, retention, discipline, and conduct of the Individual Defendants. Specifically, Defendant Davis was and is responsible for the improper organization of inmate housing at CSP-SAC, the improper classification of inmates at CSP-SAC, the improper security and reaction to violence of inmates at CSP-SAC, and the improper customs and practices for the movement of inmates at CSP-SAC. At all relevant times, Defendant Davis acted under color of law, to wit, under the color of the statutes, ordinances, regulations, policies, customs, and usages of the State of California, CDCR, and CSP-SAC and under the color of the statutes and regulations of the State of California. On information and belief, Defendant Davis is and was at all relevant times a resident of this judicial district.

15.     In his individual capacity, at all relevant times, Defendant DERRICK MARION ("Marion") was a duly appointed Chief, Office of Correctional Safety of CDCR and CSP-SAC, with the direct responsibility to operate, administer, and manage all state-operated adult prisons, including CDCR and CSP-SAC, subject to the oversight and supervision of the State of California, CDCR, and CSP-SAC's elected and non-elected officials. Defendant Marion was at all relevant times responsible for devising and implementing security and safety policies, procedures, and training for the safe housing, classification, escorting, protecting, and monitoring of inmates as well as all policies, procedures, and training for preventing, and responding to inmate-on-inmate attacks, violence, and disturbances. Defendant Marion was and is directly responsible for the supervision, training, hiring, retention, discipline, and conduct of the Individual Defendants. Specifically, Defendant Marion was and is responsible for the improper organization of inmate housing at CSP-SAC, the improper classification of inmates at CSP-SAC, the improper security and reaction to violence of inmates at CSP-SAC, and the improper customs and practices for the movement of inmates at CSP-SAC. At all relevant times, Defendant Marion acted under color of law, to wit, under the color of the statutes, ordinances, regulations, policies, customs, and usages of the State of California, CDCR, and CSP-SAC and under the color of the statutes and regulations of the State of California. On information and belief, Defendant Marion is and was at all relevant times a resident of this judicial district.

16.     In his individual capacity, at all relevant times, Defendant WILLIE DOBIE III ("Dobie") was a duly appointed Chief – Office of Policy Standardization – Division of Adult Institutions of CDCR and CSP-SAC, previously Correctional Lieutenant and Captain, with the direct responsibility to operate, administer, and manage all state-operated adult prisons, including CDCR and CSP-SAC, subject to the oversight and supervision of the State of California, CDCR, and CSP-SAC's elected and non-elected officials. Defendant Dobie was at all relevant times

responsible for devising and implementing security and safety policies, procedures, and training for the safe housing, classification, escorting, protecting, and monitoring of inmates as well as all policies, procedures, and training for preventing, and responding to inmate-on-inmate attacks, violence, and disturbances. Defendant Dobie was and is directly responsible for the supervision, training, hiring, retention, discipline, and conduct of the Individual Defendants. Specifically, Defendant Dobie was and is responsible for the improper organization of inmate housing at CSP-SAC, the improper classification of inmates at CSP-SAC, the improper security and reaction to violence of inmates at CSP-SAC, and the improper customs and practices for the movement of inmates at CSP-SAC. At all relevant times, Defendant Dobie acted under color of law, to wit, under the color of the statutes, ordinances, regulations, policies, customs, and usages of the State of California, CDCR, and CSP-SAC and under the color of the statutes and regulations of the State of California. On information and belief, Defendant Dobie is and was at all relevant times a resident of this judicial district.

17.     In his individual capacity, at all relevant times, Defendant JEFFREY LYNCH ("Lynch") was and is the Warden for CDCR, with the direct responsibility to operate, administer, and manage all state-operated adult prisons, including CDCR and CSP-SAC, subject to the oversight and supervision of the State of California, CDCR, and CSP-SAC's elected and non-elected officials. Defendant Lynch personally devised, planned, and effectuated the immediate supervision, policies, and action taken by correctional staff, including officers and counselors, at CSP-SAC, which is largely a level IV maximum security prison in Folsom, California where Plaintiff's and Decedent's injuries arose. Defendant Lynch was at all relevant times responsible for devising and implementing security and safety policies, procedures, and training for the safe housing, escorting, and monitoring of inmates as well as all policies, procedures, and training for preventing, and responding to inmate-on-inmate attacks, violence, and disturbances. Defendant Lynch was and is

directly responsible for the supervision, training, hiring, retention, discipline, and conduct of the Individual Defendants. Specifically, Defendant Lynch was and is responsible for the improper organization of inmate housing at CSP-SAC, the improper classification of inmates at CSP-SAC, the improper security and reaction to violence of inmates at CSP-SAC, and the improper customs and practices for the movement of inmates at CSP-SAC. At all relevant times, Defendant Lynch acted under color of law, to wit, under the color of the statutes, ordinances, regulations, policies, customs, and usages of the State of California, CDCR, and CSP-SAC and under the color of the statutes and regulations of the State of California. On information and belief, Defendant Lynch is and was at all relevant times a resident of this judicial district.

18.     In an individual capacity, at all relevant times, Defendant N. COLLINS ("Collins") was a duly appointed Correctional Case Records Analyst ("CCRA") and agent of Supervisor Defendants, and the State of California, CDCR, and CSP-SAC, subject to the oversight and supervision of the State of California, CDCR, and CSP-SAC'S elected and non-elected officials, including Supervisor Defendants; assigned to Case Records, individually and personally interacted with Decedent by and through Decedent requesting an interview. Decedent specifically informed N. Collins that his classification was inappropriately made on or about February 27, 2022 and March 10, 2022, several months prior to his death, providing N. Collins ample time and opportunity to correct the failure to properly classify and protect Decedent. At all relevant times, Defendant Collins acted under color of law, to wit, under the color of the statutes, ordinances, regulations, policies, customs, and usages of the State of California, CDCR, and CSP-SAC and under the color of the statutes and regulations of the State of California.  At all relevant times, N. Collins acted within the course and scope of his or her employment with CSP-SAC, including concerning the means by which the life and safety of inmates were secured, the criteria for placing different groups of inmates together in custody, the placement of

an inmate in areas of CSP-SAC appropriate to safeguard the life and safety of the inmates, the manner in which threats to the life and safety of an inmate were to be evaluated and acted upon, what safeguards were in place to prevent inmates who posed a threat to others in the facility from being permitted physical access to others, what actions were taken when an inmate is attacked or injured while incarcerated, and what methods of surveillance were to be used within each facility to insure immediate response to prevent or lessen incidents of violence occurring in the facility. On information and belief, Defendant Collins is and was at all relevant times a resident of this judicial district.

19.    In an individual capacity, at all relevant times, Defendant CHRISTIE ANGULO ("Angulo") was a duly appointed Correctional Counselor and agent of Supervisor Defendants, and the State of California, CDCR, and CSP-SAC, subject to the oversight and supervision of the State of California, CDCR, and CSP-SAC'S elected and non-elected officials, including Supervisor Defendants; individually and personally interacted with and interviewed Decedent as committee member of Decedent's Unit Classification Committee ("UCC") on March 25, 2022, which was several months prior to his death, providing Defendant Angulo ample time and opportunity to correct the failure to properly classify Decedent and to protect Decedent from attack. Defendant Angulo had the specific responsibility to classify and house Decedent in a location and area that would protect him from the known and obvious threat of the assailants. At all relevant times, Defendant Angulo acted under color of law, to wit, under the color of the statutes, ordinances, regulations, policies, customs, and usages of the State of California, CDCR, and CSP-SAC and under the color of the statutes and regulations of the State of California.  At all relevant times, Defendant Angulo acted within the course and scope of her employment with CSP-SAC, including concerning the means by which the life and safety of inmates were secured, the criteria for placing different groups of inmates together in custody, the placement of an inmate in areas of CSP-SAC appropriate to

safeguard the life and safety of the inmates, the manner in which threats to the life and safety of an inmate were to be evaluated and acted upon, what safeguards were in place to prevent inmates who posed a threat to others in the facility from being permitted physical access to others, what actions were taken when an inmate is attacked or injured while incarcerated, and what methods of surveillance were to be used within each facility to insure immediate response to prevent or lessen incidents of violence occurring in the facility. On information and belief, Defendant Angulo is and was at all relevant times a resident of this judicial district.

20.     In an individual capacity, at all relevant times, Defendant L. HERRERA ("Herrera") was a duly appointed Assigned Case Records Analyst and agent of Supervisor Defendants, and the State of California, CDCR, and CSP-SAC, subject to the oversight and supervision of the State of California, CDCR, and CSP-SAC'S elected and non-elected officials, including Supervisor Defendants; individually and had a personally responsibility to protect through classification of Decedent, as part of his UCC, prior to his death. Defendant Herrera had the specific responsibility to classify and house Decedent in a location and area that would protect him from the known and obvious threat of the assailants. At all relevant times, Defendant Herrera acted under color of law, to wit, under the color of the statutes, ordinances, regulations, policies, customs, and usages of the State of California, CDCR, and CSP-SAC and under the color of the statutes and regulations of the State of California.  At all relevant times, Defendant Herrera acted within the course and scope of his or her employment with CSP-SAC, including concerning the means by which the life and safety of inmates were secured, the criteria for placing different groups of inmates together in custody, the placement of an inmate in areas of CSP-SAC appropriate to safeguard the life and safety of the inmates, the manner in which threats to the life and safety of an inmate were to be evaluated and acted upon, what safeguards were in place to prevent inmates who posed a threat to others in the facility from being permitted physical access to others, what actions

were taken when an inmate is attacked or injured while incarcerated, and what methods of surveillance were to be used within each facility to insure immediate response to prevent or lessen incidents of violence occurring in the facility. On information and belief, Defendant Herrera is and was at all relevant times a resident of this judicial district

21.    In an individual capacity, at all relevant times, Defendant Y. ARNOLD ("Arnold") was a duly appointed Correctional Counselor and agent of Supervisor Defendants, and the State of California, CDCR, and CSP-SAC, subject to the oversight and supervision of the State of California, CDCR, and CSP-SAC'S elected and non-elected officials, including Supervisor Defendants; individually and personally interacted with and interviewed Decedent as committee member of Decedent's UCC, which was several months prior to his death, providing Defendant Arnold ample time and opportunity to correct the failure to properly classify Decedent and to protect Decedent from attack. Defendant Arnold had the specific responsibility to classify and house Decedent in a location and area that would protect him from the known and obvious threat of the assailants. At all relevant times, Defendant Arnold acted under color of law, to wit, under the color of the statutes, ordinances, regulations, policies, customs, and usages of the State of California, CDCR, and CSP-SAC and under the color of the statutes and regulations of the State of California. At all relevawasimes, Defendant Arnold acted within the course and scope of her employment with CSP-SAC, including concerning the means by which the life and safety of inmates were secured, the criteria for placing different groups of inmates together in custody, the placement of an inmate in areas of CSP-SAC appropriate to safeguard the life and safety of the inmates, the manner in which threats to the life and safety of an inmate were to be evaluated and acted upon, what safeguards were in place to prevent inmates who posed a threat to others in the facility from being permitted physical access to others, what actions were taken when an inmate is attacked or injured while incarcerated, and what methods of

surveillance were to be used within each facility to insure immediate response to prevent or lessen incidents of violence occurring in the facility. On information and belief, Defendant Arnold is and was at all relevant times a resident of this judicial district.

22.     In an individual capacity, at all relevant times, Defendant YVETTE CASTILLO ("Castillo") was a duly appointed Correctional Counselor and agent of Supervisor Defendants, and the State of California, CDCR, and CSP-SAC, subject to the oversight and supervision of the State of California, CDCR, and CSP-SAC'S elected and non-elected officials, including Supervisor Defendants; individually and personally interacted with and interviewed Decedent as committee member of Decedent's UCC, which was several months prior to his death, providing Defendant Castillo ample time and opportunity to correct the failure to properly classify Decedent and to protect Decedent from attack. Defendant Castillo had the specific responsibility to classify and house Decedent in a location and area that would protect him from the known and obvious threat of the assailants. At all relevant times, Defendant Castillo acted under color of law, to wit, under the color of the statutes, ordinances, regulations, policies, customs, and usages of the State of California, CDCR, and CSP-SAC and under the color of the statutes and regulations of the State of California.  At all relevant times, Defendant Castillo acted within the course and scope of her employment with CSP-SAC, including concerning the means by which the life and safety of inmates were secured, the criteria for placing different groups of inmates together in custody, the placement of an inmate in areas of CSP-SAC appropriate to safeguard the life and safety of the inmates, the manner in which threats to the life and safety of an inmate were to be evaluated and acted upon, what safeguards were in place to prevent inmates who posed a threat to others in the facility from being permitted physical access to others, what actions were taken when an inmate is attacked or injured while incarcerated, and what methods of surveillance were to be used within each facility to insure immediate response to

prevent or lessen incidents of violence occurring in the facility. On information and belief, Defendant Castillo is and was at all relevant times a resident of this judicial district.

23.     In an individual capacity, at all relevant times, Defendant DOE PONCE ("Ponce") was a duly appointed Assigned Transitional Counselor and agent of Supervisor Defendants, and the State of California, CDCR, and CSP-SAC, subject to the oversight and supervision of the State of California, CDCR, and CSP-SAC'S elected and non-elected officials, including Supervisor Defendants; individually and had a personal responsibility as part of Decedent's UCC, which was several months prior to his death, providing Defendant Ponce ample time and opportunity to correct the failure to properly classify Decedent and to protect Decedent from attack. Defendant Ponce had the specific responsibility to classify and house Decedent in a location and area that would protect him from the known and obvious threat of the assailants. At all relevant times, Defendant Ponce acted under color of law, to wit, under the color of the statutes, ordinances, regulations, policies, customs, and usages of the State of California, CDCR, and CSP-SAC and under the color of the statutes and regulations of the State of California. At all relevant times, Defendant Ponce acted within the course and scope of her employment with CSP-SAC, including concerning the means by which the life and safety of inmates were secured, the criteria for placing different groups of inmates together in custody, the placement of an inmate in areas of CSP-SAC appropriate to safeguard the life and safety of the inmates, the manner in which threats to the life and safety of an inmate were to be evaluated and acted upon, what safeguards were in place to prevent inmates who posed a threat to others in the facility from being permitted physical access to others, what actions were taken when an inmate is attacked or injured while incarcerated, and what methods of surveillance were to be used within each facility to insure immediate response to prevent or lessen incidents of violence occurring in

the facility. On information and belief, Defendant Ponce is and was at all relevant times a resident of this judicial district.

24.     In his or her individual capacity, at all relevant times, Defendant DOE 1 was a Correctional Counsellor and UCC Supervisor duly appointed employee or agent of the State of California, CDCR, and CSP-SAC, subject to the oversight and supervision of Defendants Macomber, Barretto, Lewis, Choate, Gipson, Davis, Marion, Dobie, and Lynch, and the State of California, CDCR, and CSP-SAC'S elected and non-elected officials. At all relevant times, Defendant DOE 1 acted under color of law, to wit, under the color of the statutes, ordinances, regulations, policies, customs, and usages of the State of California, CDCR, and CSP-SAC and under the color of the statutes and regulations of the State of California. At all relevant times, Defendant DOE 1 acted within the course and scope of his or her employment with CSP-SAC, including concerning the means by which the life and safety of inmates were secured, the criteria for placing different groups of inmates together in custody, the placement of an inmate in areas of CSP-SAC appropriate to safeguard the life and safety of the inmates, the manner in which threats to the life and safety of an inmate were to be evaluated and acted upon, what safeguards were in place to prevent inmates who posed a threat to others in the facility from being permitted physical access to others, what actions were taken when an inmate is attacked or injured while incarcerated, and what methods of surveillance were to be used within each facility to insure immediate response to prevent or lessen incidents of violence occurring in the facility. On information and belief, Defendant DOE 1 is and was at all relevant times a resident of this judicial district.

25.     In his or her individual capacity, at all relevant times, Defendant DOE 2 was a Classification Staff Representatives ("CSR"), Auditor, and/or UCC Supervisor duly appointed employee or agent of the State of California, CDCR, and CSP-SAC, subject to the oversight and supervision of Defendants Macomber, Barretto, Lewis, Choate, Gipson, Davis, Marion, Dobie, and Lynch, and the State of

California, CDCR, and CSP-SAC'S elected and non-elected officials. At all relevant times, Defendant DOE 2 acted under color of law, to wit, under the color of the statutes, ordinances, regulations, policies, customs, and usages of the State of California, CDCR, and CSP-SAC and under the color of the statutes and regulations of the State of California. At all relevant times, Defendant DOE 2 acted within the course and scope of his or her employment with CSP-SAC, including concerning the means by which the life and safety of inmates were secured, the criteria for placing different groups of inmates together in custody, the placement of an inmate in areas of CSP-SAC appropriate to safeguard the life and safety of the inmates, the manner in which threats to the life and safety of an inmate were to be evaluated and acted upon, what safeguards were in place to prevent inmates who posed a threat to others in the facility from being permitted physical access to others, what actions were taken when an inmate is attacked or injured while incarcerated, and what methods of surveillance were to be used within each facility to insure immediate response to prevent or lessen incidents of violence occurring in the facility. It was Defendant DOE 2's individual responsibility to audit Decedent's and the assailant's classifications to ensure that they were correct and protected Decedent. On information and belief, Defendant DOE 2 is and was at all relevant times a resident of this judicial district.

26.     In his or her individual capacity, at all relevant times, Defendant DOE 3 was a Correctional Counsellor and UCC Recorder duly appointed employee or agent of the State of California, CDCR, and CSP-SAC, subject to the oversight and supervision of Defendants Macomber, Barretto, Lewis, Choate, Gipson, Davis, Marion, Dobie, and Lynch, and the State of California, CDCR, and CSP-SAC'S elected and non-elected officials. At all relevant times, Defendant DOE 3 acted under color of law, to wit, under the color of the statutes, ordinances, regulations, policies, customs, and usages of the State of California, CDCR, and CSP-SAC and under the color of the statutes and regulations of the State of California. At all

relevant times, Defendant DOE 3 acted within the course and scope of his or her employment with CSP-SAC, including concerning the means by which the life and safety of inmates were secured, the criteria for placing different groups of inmates together in custody, the placement of an inmate in areas of CSP-SAC appropriate to safeguard the life and safety of the inmates, the manner in which threats to the life and safety of an inmate were to be evaluated and acted upon, what safeguards were in place to prevent inmates who posed a threat to others in the facility from being permitted physical access to others, what actions were taken when an inmate is attacked or injured while incarcerated, and what methods of surveillance were to be used within each facility to insure immediate response to prevent or lessen incidents of violence occurring in the facility. Defendant DOE 3 was specifically and individually responsible for collecting, researching, and presenting all relevant information regarding Decedent and Assailant's classifications so that the UCC can make an informed decision. On information and belief, Defendant DOE 3 is and was at all relevant times a resident of this judicial district.

27.     Upon information and belief, at all relevant times, Defendant DOES 1-5 (or "Classification DOES"), were and are in their individual capacities, duly appointed agents of CDCR and CSP-SAC, subject to the oversight and supervision of the State of California, CDCR, and CSP-SAC'S elected and non-elected officials. Defendant DOES 1-5 were Correctional Counselors and parties to the UCC for Decedent and Assailants. At all relevant times, Defendant DOES 1-5 acted under color of law, to wit, under the color of the statutes, ordinances, regulations, policies, customs, and usages of the State of California, CDCR, and CSP-SAC and under the color of the statutes and regulations of the State of California. At all relevant times, Defendant DOES 1-5 acted within the course and scope of their employment with CSP-SAC, including concerning the means by which the life and safety of inmates were secured, the criteria for placing different groups of inmates together in custody, the placement of an inmate in areas of CSP-SAC appropriate to safeguard the life

and safety of the inmates, the manner in which threats to the life and safety of an inmate were to be evaluated and acted upon, what safeguards were in place to prevent inmates who posed a threat to others in the facility from being permitted physical access to others, what actions were taken when an inmate is attacked or injured while incarcerated, and what methods of surveillance were to be used within each facility to insure immediate response to prevent or lessen incidents of violence occurring in the facility. On information and belief, Defendant DOES 1-5 are and were at all relevant times residents of this judicial district.

28.     Upon information and belief, Defendant Classification DOES had specific personal knowledge derived from each inmates' C-File and UCC Hearings, including with regard to Decedent and Assailants, as to all factors that must be taken into consideration for the proper classification of inmate, such as criminal history, gang affiliation, violent disposition, enemies lists, and concerns for inmate safety, well in advance of this incident. Defendant Classification DOES were deficient and deliberately indifferent in their failure to protect and classify Decedent knowing that he would be exposed without adequate protection and surveillance to Assailants.

29.     In his or her individual capacity, at all relevant times, Defendant DOE 6 was a duly appointed Correctional Officer, employee or agent of the State of California, CDCR, and CSP-SAC, subject to the oversight and supervision of the Supervisor Defendants and the State of California, CDCR, and CSP-SAC'S elected and non-elected officials. At all relevant times, Defendant DOE 6 acted under color of law, to wit, under the color of the statutes, ordinances, regulations, policies, customs, and usages of the State of California, CDCR, and CSP-SAC and under the color of the statutes and regulations of the State of California. At all relevant times, Defendant DOE 6 acted within the course and scope of his employment with CSP-SAC, including concerning the means by which the life and safety of inmates were secured and protected, the manner in which threats to the life and safety of an inmate were to be acted upon, what safeguards were in place to prevent inmates who

posed a threat to others in the facility from being permitted physical access to others, what actions were taken when an inmate is attacked or injured while incarcerated, and what methods of inspection and surveillance were to be used within each facility to insure prevention and immediate response to prevent or lessen incidents of violence occurring in the facility. Defendant DOE 6 was specifically assigned to guard, monitor, safeguard, and protect Decedent in the Yard where the incident occurred. Defendant DOE 6 was and is responsible for the reckless disregard for the life and safety of Decedent by his actions and inactions in allowing the violent attack to occur, failing to timely stop it, and failing to properly render medical aid to Decedent. On information and belief, Defendant DOE 6 is and was at all relevant times a resident of this judicial district.

30.     In his or her individual capacity, at all relevant times, Defendant DOE 7 was a duly appointed Correctional Officer, employee or agent of the State of California, CDCR, and CSP-SAC, subject to the oversight and supervision of the Supervisor Defendants and the State of California, CDCR, and CSP-SAC'S elected and non-elected officials. At all relevant times, Defendant DOE 7 acted under color of law, to wit, under the color of the statutes, ordinances, regulations, policies, customs, and usages of the State of California, CDCR, and CSP-SAC and under the color of the statutes and regulations of the State of California. At all relevant times, Defendant DOE 7 acted within the course and scope of his employment with CSP-SAC, including concerning the means by which the life and safety of inmates were secured and protected, the manner in which threats to the life and safety of an inmate were to be acted upon, what safeguards were in place to prevent inmates who posed a threat to others in the facility from being permitted physical access to others, what actions were taken when an inmate is attacked or injured while incarcerated, and what methods of inspection and surveillance were to be used within each facility to insure prevention and immediate response to prevent or lessen incidents of violence occurring in the facility. Defendant DOE 7 was specifically

assigned to guard, monitor, safeguard, and protect Decedent in the Yard where the incident occurred. Defendant DOE 7 was and is responsible for the reckless disregard for the life and safety of Decedent by his actions and inactions in allowing the violent attack to occur, failing to timely stop it, and failing to properly render medical aid to Decedent. On information and belief, Defendant DOE 7 is and was at all relevant times a resident of this judicial district.

31.    In his or her individual capacity, at all relevant times, Defendant DOE 8 was a duly appointed employee or agent of the State of California, CDCR, and CSP-SAC, subject to the oversight and supervision of Supervisor Defendants and the State of California, CDCR, and CSP-SAC'S elected and non-elected officials. At all relevant times, Defendant DOE 8 acted under color of law, to wit, under the color of the statutes, ordinances, regulations, policies, customs, and usages of the State of California, CDCR, and CSP-SAC and under the color of the statutes and regulations of the State of California. At all relevant times, Defendant DOE 8 acted within the course and scope of his or her employment with CSP-SAC, including concerning the means by which the life and safety of inmates were secured and protected, the manner in which threats to the life and safety of an inmate were to be acted upon, what safeguards were in place to prevent inmates who posed a threat to others in the facility from being permitted physical access to others, what actions were taken when an inmate is attacked or injured while incarcerated, and what methods of inspection and surveillance were to be used within each facility to insure prevention and immediate response to prevent or lessen incidents of violence occurring in the facility. Defendant DOE 8 was specifically assigned to guard, monitor, safeguard, and protect Decedent in the Yard where the incident occurred. Defendant DOE 8 was and is responsible for the reckless disregard for the life and safety of Decedent by his or her actions and inactions in allowing the violent attack to occur and failing to timely stop it. Defendant DOE 8 was armed with a rifle capable of being utilized and specifically trained to be utilized to protect Decedent from the substantial risk of

death or serious bodily injury when being attacked by inmates but failed to use any force as required under these circumstances. On information and belief, Defendant DOE 8 is and was at all relevant times a resident of this judicial district.

32.     In his or her individual capacity, at all relevant times, Defendant DOE 9 was a duly appointed employee or agent of the State of California, CDCR, and CSP-SAC, subject to the oversight and supervision of Supervisor Defendants and the State of California, CDCR, and CSP-SAC'S elected and non-elected officials. At all relevant times, Defendant DOE 9 acted under color of law, to wit, under the color of the statutes, ordinances, regulations, policies, customs, and usages of the State of California, CDCR, and CSP-SAC and under the color of the statutes and regulations of the State of California. At all relevant times, Defendant DOE 9 acted within the course and scope of his or her employment with CSP-SAC, including concerning the means by which the life and safety of inmates were secured and protected, the manner in which threats to the life and safety of an inmate were to be acted upon, what safeguards were in place to prevent inmates who posed a threat to others in the facility from being permitted physical access to others, what actions were taken when an inmate is attacked or injured while incarcerated, and what methods of inspection and surveillance were to be used within each facility to insure prevention and immediate response to prevent or lessen incidents of violence occurring in the facility. Defendant DOE 9 was specifically assigned to guard, monitor, safeguard, and protect Decedent in the Yard where the incident occurred. Defendant DOE 9 was and is responsible for the reckless disregard for the life and safety of Decedent by his or her actions and inactions in allowing the violent attack to occur and failing to timely stop it. Defendant DOE 9 was armed with a rifle capable of being utilized and specifically trained to be utilized to protect Decedent from the substantial risk of death or serious bodily injury when being attacked by inmates but failed to use any force as required under these circumstances. On information and belief, Defendant DOE 9 is and was at all relevant times a resident of this judicial district.

33.     Upon information and belief, at all relevant times, Defendant DOES 6-10 (or "Correctional Officer DOES"), were and are in their individual capacities, duly appointed agents of CDCR and CSP-SAC, subject to the oversight and supervision of the State of California, CDCR, and CSP-SAC'S elected and non-elected officials. Defendant DOES 6-10 were Correctional Officers charged with the security and protection of Decedent from Assailants, including as sentries on the ground and in elevated positions armed with lethal and less-lethal weapons. At all relevant times, Defendant DOES 6-10 acted under color of law, to wit, under the color of the statutes, ordinances, regulations, policies, customs, and usages of the State of California, CDCR, and CSP-SAC and under the color of the statutes and regulations of the State of California. At all relevant times, Defendant Correctional Officer DOES acted within the course and scope of their employment with CSP-SAC, including concerning the means by which the life and safety of inmates were secured and protected, the manner in which threats to the life and safety of an inmate were to be acted upon, what safeguards were in place to prevent inmates who posed a threat to others in the facility from being permitted physical access to others, what actions were taken when an inmate is attacked or injured while incarcerated, and what methods of inspection and surveillance were to be used within each facility to insure prevention and immediate response to prevent or lessen incidents of violence occurring in the facility.

34.     Defendant Correctional Officer DOES were specifically assigned to guard, monitor, safeguard, and protect Decedent in the Recreation Yard where the incident occurred. Defendant Correctional Officer DOES were and are responsible for their reckless disregard for the life and safety of Decedent by their actions and inactions in allowing the violent attack to occur, failing to prevent Assailants from arming themselves with inmate-manufactured weapons, failing to prevent the coordination and planning of the attack, failing to timely stop the attack, and failing to properly render medical aid to Decedent. On information and belief, Defendant

Correctional Officer DOES were and are at all relevant times residents of this judicial district.

35.     Upon information and belief, Defendant Correctional Officer DOES had specific personal knowledge as CO's assigned to various the protect the inmates, including with regard to Decedent and Assailants, within the specific housing units and associated yards in question and from being assigned to attend UCC's, of inmates' criminal history, gang affiliation, violent disposition, enemies lists, and concerns for inmate safety, well in advance of this incident. Defendant Correctional Officer DOES were deficient and deliberately indifferent in their failure to protect Decedent knowing that there as a substantial likelihood he would be exposed to the attack of Assailants.

36.     CDCR manages and operates state prisons, including CSP-SAC, where Decedent was housed during this incident. At all relevant times, CDCR and CSP-SAC were the employers of the Individual Defendants.

37.     Plaintiff is ignorant of the true names and capacities of Defendants sued herein as Defendant DOES 1-10, inclusive, and therefore sues these Defendants by such fictitious names. Plaintiff is informed, believes, and alleges, that each of the fictitiously named Defendants is legally responsible, intentionally, negligently or in some other actionable manner, for the events and happenings hereinafter referred to, and thereby legally caused the injuries, damages, and violations and/or deprivation of rights herein alleged. Plaintiff will seek leave of Court to amend this Complaint and state the true names and/or capacities of said fictitiously named Defendants when those have been ascertained.

## **FACTS COMMON TO ALL CLAIMS FOR RELIEF**

38.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 37 of his Complaint with the same force and effect as if fully set forth herein.

39.    On information and belief, the Individual Defendants, including the Supervisor DOES and DOES 1-10, individually knew the following were problems that must be resolved in order to facilitate a safe environment at CDCR, and failed to resolve them: (a) providing inmates with access to programs; (b) improving access to rehabilitative programming; (c) gang management; (d) increase prospective credit earnings for non-violent inmates; (e) allow non-violent inmates over 50% of time served to be referred to parole consideration; (f) increase reentry services; (g) implement classification changes to provide more flexibility to housing environments; (h) refine which offenders require placement in level IV prisons; (i) classify and house offenders to promote safety and security; (j) failing to maintain a 6-to-1 inmate-to-staff ratio; (k) offer graduated housing and privileges as incentives for positive behavior; (l) impose consequences for gang-related behaviors; (m) provide support for inmates seeing to disengage from gangs; and (n) use segregated housing for gang associates and those suspected of serious disciplinary behavior.

40.    The Individual Defendants individually knew that custody designation is based on: (a) the inmate's total term; (b) the inmate's escape history; (c) any active law enforcement felony holds; (d) inmates with high notoriety or public interest; (e) inmates with an identified management concern typically including a threat to inmates of community; and (f) a finding of guild for a serious, felony-level rule violation.

41.    The Individual Defendants individually knew that the primary factor in the increased violence was the permitted growth of prison gangs.

42.    Upon information and belief, the Individual Defendants individually the custodial factors for the housing designations for Decedent and Assailants, long prior to the incident.

43.    CDCR has had nearly $30 Million in housing conversions for the purpose of protecting inmates from violent gang-affiliated inmates and had nearly $6 Million in investigative staff to monitor gang activity in prisons. Nevertheless,

CDCR, through the individual Defendants, consistently fails to protect inmates from gang-affiliated inmates and fails to prevent gang activity.

44.     The Individual Defendants individually knew that "Programming" to reduce recidivism, and transition offenders into contributing members of society includes: academic education (diplomas and degrees); other education (e.g., Arts-in-Corrections for possible impact on inmate behavior, critical thinking, positive relationship building, and healthy behavior); career technical education (trade certificates, computer familiarity); cognitive behavioral treatment; substance use disorder treatment (reduce gang activity, reduce violence); and transition programs (job readiness, job search, financial literacy, obtaining state-issued identification cards, etc.).

45.     Decedent engaged in Programming while at CSP-SAC, was a short-timer set to be released between on or around December 19, 2022, received Educational Merit Credit, and attended classes with Mary B. Perry High School while in custody. Despite the shot time prior to his scheduled release, out of fear for his safety, he had made a special request for an attorney to help him get out sooner.

46.     Upon information and belief, during his term, Decedent had no record of violence or disobedience. Decedent attempted to avoid contact with active gang members and was not a gang member himself. He attended Mary B. Perry High School while he was incarcerated, earning his diploma in November of 2019. He received numerous recognitions from the CDCR, including a certificate of completion of the GEO Reentry Substance Abuse Treatment Program. Such participation in rehabilitative and educational coursework is known by Defendants to be discouraged, disallowed, stigmatized, and or frowned upon by members and associates of all prison and street gangs, making such participants targets of attack.

47.     Upon information and belief, inmates at CDCR, like Decedent, are specifically encouraged to avoid gang activities and drop out of gang affiliation for the rehabilitative goals of CDCR, and for the safety, security, and management of

1  operations at CDCR. As a result of this encouragement, it is understood by inmates
2  and CDCR staff that inmates who are not active gang members will be separated
3  from active gang members and protected from such gang members. It is common
4  knowledge that active street-gang members, including the Surenos, which at least
5  some of the Assailants belong, are housed as GP inmates.

6      48.    Upon information and belief, the Assailants did not engage in
7  Programming at CSP-SAC and or CDCR.

8      49.    The Individual Defendants individually knew that gang-affiliated
9  inmates target for attack inmates who engage in Programming, and who are short-
10  timers, and view them as vulnerable.

11     50.    Safety and security are supposed to be of paramount importance to the
12  Individual Defendants. To create a safe environment for inmates, the Individual
13  Defendants must but failed to foster a positive atmosphere that promotes
14  rehabilitation. Specifically, officials must control and eliminate drugs and
15  contraband, especially inmate manufactured weapons. It is well known to the
16  Defendant Officials that the use of drugs by inmates presents a serious threat to the
17  safety and security of CDCR institutions. Drug trafficking increases assaults, creates
18  power struggles within the inmate population, creates underground economies,
19  reduces programming benefits and adherence, and negatively impacts inmates'
20  mental health. Interdiction must include drug interdiction officers, x-ray machines at
21  all entrances, drug and contraband detection canines, ION mobility spectrometry
22  technology, random drug urinalysis of inmates, video surveillance equipment in
23  visitation rooms, and access to substance use disorder treatment. CDCR has been
24  given approximately $8 Million to control drugs and contraband from entering
25  prisons, for more staff and package inspections. Nevertheless, the individual
26  Defendants consistently failed to create a safe environment for Decedent.

27     51.    Camera presence itself is a deterrent from violent and illegal behavior.
28  Video recording assists with the prosecution of rule violators. However, video

monitoring is of specific importance for successful deterrence, reduction of negative behavior, and inmate safety. It allows Correctional Officers to respond prior to violence to stop an attack from occurring and at the least allows Correctional Officers to respond more quickly and appropriately to a violent attack. Video use and monitoring is most important in Level IV facilities, which house the longest-term offenders, and the most violent offenders. Body-worn cameras are particularly important to address staff and inmate misconduct, increase staff accountability and professionalism, ensure ethical behavior and protection of inmates. Prior to this incident, it was required for Correctional Officers to wear a BWC and it was known that BWCs, at a minimum, provides evidence and transparency in resolving allegations of staff and inmate misconduct, use of force, and distribution of contraband. High-quality visual recordings of incidents serve as significant evidence in investigations as well as in administrative, civil, or criminal proceedings. The existence of audio and video evidence improves the department's ability to successfully conduct and conclude investigations compared to investigations that are reliant solely on eyewitness testimony. It is important that the BWC remain on as much as possible in order to capture any incidents or problems that need to be addressed and to resolve any discrepancies. This will help to ensure honest practices and adherence to department rules, which will increase safety and security within the institutions. Nevertheless, the individual Defendants consistently failed to have and/or monitor videos and failed to implement reasonable measures to prevent, deter, or monitor threatening gang-affiliated inmates' activities, such as Assailants, which threaten the life and safety of vulnerable inmates such as Decedent.

52.   Cell phone blocking technology is increasingly important for the safety of inmates. It prevents illegal communication between inmates planning an attack or other illegal activity. CDCR Officials know that cell phones in prisons create considerable risk to institution security. Nevertheless, the individual Defendants consistently failed to block, search for, and confiscate cell phones.

53.     At the time of the incident, CSP-SAC had a total bed capacity of 2,597 according to the Blueprint Overcrowding Capacity, but nevertheless a total of 3,394 maximum bed capacity. At the time of the incident, there were approximately 2,010 inmates at CSP-SAC, equating to approximately 23% vacancy, with 1,817 inmates classified with a score of 160 or higher designated as Inmate Level IV. The General Population ("GP") capacity was 1,248 with only 1,010 inmates in GP. Additionally, there were 906 inmates serving life sentences—of those includes the Assailants and does not include Decedent.

54.     In the month of May 2022, when the incident occurred, there was an average of 18.21 Inmate Disciplinary actions, including 6 assaults, 52 batteries (3 with a deadly weapon), the second highest month in that fiscal year. Interestingly, from November 2021 to November 2022, there was merely 2 disciplinary actions for possession of controlled substance, no disciplinary actions for unauthorized possession of drug paraphernalia, no disciplinary actions of under the influence of a controlled substance, and no disciplinary actions for distribution of a controlled substance, despite there being 314 grams of heroin seized, 419.8 grams of marijuana seized, 620.91 grams of methamphetamine seized, and 381.8 grams of tobacco seized—just in May 2022. Interestingly, every month that there was a seizure event—heroin, marijuana, methamphetamine, and tobacco was found—yet CSP-SAC fails to check even monthly. There were 15 disciplinary actions for possession of a cell phone, averaging 11 per month for the 6 months prior to the incident, despite there being 22 cell phone seizure events with 39 cell phones seized. There were 25 disciplinary actions for fighting, averaging 18.5 per month in the 6 months prior to the incident. There were 6 disciplinary actions for possession or attempted manufacture of a deadly weapon, averaging 7 per month in the 6 months prior to the incident. Despite this incident, there was no disciplinary action taken between May and November 2022 for murder, and no lockdowns recorded at CSP-SAC.

55.     At all relevant times, Defendants Collins, Angulo, Herrera, Arnold, Castillo, Ponce, and DOES 1-5 ("Classification Officers") had the responsibility as members and contributors to the UCC hearing for Decedent and Assailants to determine their proper designation and housing and ultimately how Decedent would be protected from Assailants while in custody at CSP-SAC. Defendant Classification Officers had the responsibility to review all of Decedent's and Assailants' historical records available and compile all case factors relevant to each of their safety and security in a "Classification Committee Chrono". Defendant Classification Officers also had the responsibility to present all relevant case factor information to the UCC so that the Committee could make a proper and informed decision based on Decedent's individual safety and security concerns and to ensure that Decedent was adequately protected while in the custody and control of CDCR and its officials. Nevertheless, Defendant Classification Officers showed deliberate indifference and a conscious disregard by failing to review all of Decedent's historical records to compile all relevant case factors into the Chrono and therefore failing to present all relevant information to the UCC, intentionally or recklessly omitted critical information related to Decedent's safety and security concerns, intentionally or recklessly presented only case factors related Decedent's rule's violations as opposed to his vulnerability and safety. Defendant Classification Officers' knowing, and reckless failures created the environment and dangerous condition that failed to protect Decedent, which was a substantial factor in causing his ultimate injury and death.

56.     On July 28, 2015, at 16 years' old, Decedent was sentenced in San Bernardino County to serve eight years. He was arrested as a minor for merely being in a house where guns were sold, despite not being part of a gang. On May 25, 2017, after he turned 18 years old, Decedent was transferred and admitted to CDCR.

57.     While at CSP-SAC, Decedent was in fear of his life and made an effort to be released as soon as possible. Decedent requested an interview with Defendant

1 Correctional Officers several times to ensure that all his educational and other
2 credits were calculated correctly so that there was no delay in his release.

3     58.    On March 17, 2017, Principal of Mary B. Perry High School, Martin
4 Griffin, from the CDCR Division of Juvenile Justice, Century Youth Correctional
5 Facility, notified Plaintiff that Decedent was making progress in all courses from
6 2016 to 2017 semesters.

7     59.    On November 8, 2017, Decedent earned and received a Certificate of
8 Completion from CDCR, a GEO Substance Use Disorder Treatment Program,
9 "Participant of the Week" Certificate, signed by Program Director Janice Higgins
10 BA CATC III of CDCR and Decedent's Transitional Counselor Ms. Ponce.

11     60.    On January 29, 2018, Decedent earned and received a Certificate of
12 Completion from CDCR's Office of Offender Services, for completing the GEO
13 Reentry Substance Abuse Treatment Program, signed by Program Director Janice
14 Higgins BA CATC III of CDCR and Decedent's Correctional Counselor III Yvette
15 Castillo.

16     61.    On May 21, 2018, San Bernardino County Probation Officer II William
17 Brown, notified Decedent that he may be eligible for an Honorable Discharge from
18 CDCR, Division of Juvenile Justice ("DJJ") pursuant to Welfare and Institutions
19 Code §1178(a), because Decedent met the following requirements: (i) it had been 18
20 months or more since discharge from DJJ; (ii) he completed his County probation
21 term; (iii) he showed the ability to desist from criminal behavior; and (iv) he
22 initiated a successful transition into adulthood.

23     62.    On November 7, 2019, Decedent earned and received from the State of
24 California State Board of Education, his Diploma of Graduation for the satisfactory
25 completion of High School.

26     63.    Upon information and belief, the Assailants were and are dangerous
27 gang-affiliated inmates serving life sentences for crimes such as murder, committing

28

a street gang act in commission of a violent felony, assault with a firearm, and enhancements for use of a firearm.

64.    Assailant Avila, was a 39-year-old male, admitted from San Diego County to CDCR on February 16, 2017, to serve life with the possibility of parole for first-degree murder, a third strike; possessing/owning a firearm with a violent felony conviction, a second strike; possession of ammunition by a prohibited person; attempting first-degree murder, a third strike; and enhancements for the intentional discharge of a firearm causing great bodily injury/death.

65.    Assailant Avila was also sentenced in CSP-SAC in 2021 to serve 11 years for assault by a prisoner with a deadly weapon or force likely to produce great bodily injury, an in-prison, second strike offense. Like here, during this attempted murder of an inmate, Assailant Avila specifically targeted, in coordination with other gang affiliates, a vulnerable inmate, who was a gang drop-out, in protective custody, and was attempting to take classes to better his life. Like here, in that attempted murder, Assailant Avila and his cohorts were not assigned to the same housing unit as their victim. Assailant Avila and his cohorts waited in the yard for their victim to pass by, knowing that CDCR and CSP-SAC have minimal guards on duty, who will not intervene to stop an attempt on the life of another inmate.

66.    The individual Defendants specifically knew of the prison dynamics and politics that made certain inmates vulnerable to attack by others identified as dangerous. Defendants each knew the specific risks inmates face while being housed at CSP-SAC and were charged with implementing the appropriate training, policy, and supervision programs to ensure their Classification Committee members and Correctional Officers are property assessing threats and protecting inmates under their care. Defendants knew that placing a young man, soon to be released, without gang affiliation, who is participating in rehabilitation programs would be at specific risk of substantial harm, including life-threatening harm by the hands of active gang members.

67.     Defendants specifically knew how CSP-SAC was designed and how the housing units therein were structured, including who would be housed in each housing unit based on those individual inmates' needs and risk factors. Further, said Defendants specifically knew that inmates that were not housed together, specifically because of security and protection concerns, would be forced to cross paths with and be in locations with those inmates who pose a substantial risk of harm to them. Nevertheless, with deliberate indifference said Defendants failed to restructure, failed to redesign, and failed to reorganize the housing unit assignments so that vulnerable inmates such as Decedent were not forced to be in the same yard as those inmates who pose a substantial risk of harm to them.

68.     Defendants generated and instituted the grossly inadequate custom, practice and training, including at CSP-SAC, causing Defendant Classification and Correctional Officers to erroneously believe that they had no choice but to designate inmates in such areas within CSP-SAC where vulnerable inmates such as Decedent were forced to be in the same yard as those inmates who pose a substantial risk of harm to them.

69.     Defendants generated and instituted the grossly inadequate custom, practice and training, including at CSP-SAC, that allowed known to be violent and deadly inmates, with records of in-custody rules violations, to manufacture weapons, including weapons that are created from tools issues by CSP-SAC staff to inmates, carry said weapons into recreational yards, and use said weapons on other inmates.

70.     Defendants generated and instituted the grossly inadequate custom, practice and training, including at CSP-SAC, that allowed inmates with different classification statuses to be in a recreation yard simultaneously, without adequately numbers of Correctional Officers to protect against violent attacks, without adequately equipping Correctional Officers with the appropriate tools de-escalate or intervene in any violent attacks, and without adequate personal and electronic

surveillance to deter attacks from occurring and deter future occurrences by investigate thereafter and punishing those responsible.

71.    Upon information and belief, prior to this incident, Defendants knew that there were problems with informing staff (including custodial officers and counselors) of the criteria for inmate designations and a lack of meaningful individualized assessment for inmates under their care; knew that staff had a long-standing history of failure to analyze housing compatibility between prisoners; knew that staff had a long-standing history of failing to screen, train, and professionalize staff; knew that staff had a long-standing history of failing to keep prisoners occupied with pro-social activities and encourage rehabilitative behavior; knew that staff had a long-standing history of failing to take steps to reduce violence in the GP yards; knew that non-gang members are particularly vulnerable to attack; and knew that GP/gang-affiliated inmates "green-light" non-gang member inmates (which is common prisoner vernacular for permission to kill a person on sight).

72.    Upon information and belief, prior to this incident, Defendants were responsible for and failed to develop and implement a plan to keep inmates safe, such as Decedent, to include a sufficient number of custodial officers present in yards; sufficient number of evidence-based programs that reduce recidivism and violence; the careful screening, selection, hiring, and training of custodial staff interacting with vulnerable inmate populations to create a culture of professionalism; and to get gang shot-callers, drugs, weapons, and cell phones out of inmates' hands and out of the yards.

73.    Upon information and belief, prior to this incident, Defendants knew that UCC hearings are a mere check in the box, knowing that staff take only an average of 10 minutes to conduct hearings, without the participation of members present, and without adequate time to participate, without participation of the inmate, and without discussing, evaluating, and inquiring into all relevant case factors for inmates, and without voicing any concerns and recommendations.

74.     At all relevant times, Defendant Classification Officers had the responsibility of Chairperson, Recorder, and committee member of the UCC hearings for Decedent and Assailants to determine their designation and housing and ultimately how Decedent would be protected while at CSP-SAC. Defendant Classification Officers had the specific responsibility to review all of Decedent's and Assailants historical records available and compile all case factors relevant to Decedent's safety and security in a Classification Committee Chrono. Defendant Classification Officers also had the responsibility to present all the relevant case factors to the UCC so that the Committee could make a proper and informed decision based on Decedent's individual safety and security concerns. Nevertheless, Defendant Classification Officers showed deliberate indifference and a conscious disregard when they failed to review all of Decedent's historical records to compile all relevant case factors into the Chrono and for the presentation of information at the UCC, and intentionally or recklessly omitted critical information related to Decedent's safety and security concerns. Defendant Classification Officers knowingly and recklessly created the dangerous condition that failed to protect Decedent, which was a substantial factor in causing his ultimate injury.

75.     Defendants Classification Officers were required to, yet failed to, use their custodial experience and training, correctional awareness, and a sense of correctional reasonableness to determine an inmate's suitability for dormitory, cell, and housing assignment. Defendants were required to, yet failed to, be cognizant of all available factors when determining an inmate's assignment including: length of sentence, enemies, victimization history, criminal influence, vulnerability of the inmate, reasons for segregation, any suffix determination, history of violence, security threat group affiliation, nature of past offenses, and adaptive support needs.

76.     Upon information and belief, prior to this incident, Defendant Classification Officers personally attended and presided over Assailants' Initial UCC and/or Annual UCC hearings. Thus, Defendant Classification Officers

subjectively knew that each Assailant had a particularly violent history, was willing, capable, and had a history of attempting to murder or murdering others, would act with disregard for the rules of a correctional facility, would utilize manufactured weapons to carry out violent and deadly gang activities, were serving long-term or life sentences, and had gang affiliations.

77.     Upon information and belief, prior to this incident, Defendant Classification Officers therefore knew that Assailants posed a substantial risk of harm to Decedent. Nevertheless, Defendants designated Decedent such that he would be forced to be in the yard where he would not be segregated from those known to be a threat to him, and where he was ultimately attacked and killed.

78.     On May 6, 2022, at approximately 11:30 a.m., under the direct supervision of Defendant Correctional Officers, Decedent was attacked and killed on the recreation yard at CSP-SAC by the above-mentioned four inmate Assailants with several inmate manufactured deadly weapons.

79.     On May 6, 2022, Defendant Correctional Officers were responsible for monitoring the Recreation Yard including the Assailants programming and where Decedent was escorted by said Defendants.

80.     Upon information and belief, Defendant Correctional Officers also were assigned to the Observation Tower of the yard with the specific responsibility of controlling, safeguarding, and protecting inmates on the yard. Further, said Defendants were armed with .40 mm less-lethal baton launchers, that could also be used as a deadly force option depending on the manner in which it is deployed, and a Mini 14 rifle as a deadly force option specifically designed and officers trained to use to stop an immediate threat of death or serious bodily injury. Further, Defendant Correctional Officers were assigned elevated control booth positions, which are also armed posts specifically intended to oversee the Recreation Yard.

81.     Upon information and belief, Defendant Correctional Officers were present in the yard or in the Sentry positions during the attack on Decedent. Further,

1  Defendant Correctional Officers failed to use adequate and appropriate tactics,

2  communication, and reasonable force to stop the threat of Assailants' attack.

3       82.    Pursuant to basic officer training and CDCR policies, deadly force is

4  authorized to prevent an imminent threat of death or serious bodily injury.

5  Defendants were specifically aware of the attack as it was occurring, and aware that

6  Decedent was in the process of being stabbed to death. As the 4 Assailants

7  approached Decedent, Defendant Correctional Officers, knew Assailants each posed

8  an imminent threat of death or serious bodily injury to Decedent. Then, as the 4

9  Assailants began stabbing and/or attacking Decedent, Defendants knew that each

10  Assailants posed an imminent threat of death or serious bodily injury to Decedent.

11  Upon information and belief, each of the present Defendant Correctional Officers

12  failed to use proper force, including deadly force, to prevent the attack and save

13  Decedent from the substantial likelihood of death or serious bodily injury.

14       83.    At all relevant times herein, Defendants failed to inspect, search, and

15  supervise GP inmates to prevent the manufacturing, carrying, and use of inmate

16  manufactured deadly weapons, and the communication, planning and coordination

17  of attack on other inmates.

18       84.    At the time of the homicide, three of the Assailants, Rodriguez,

19  Velasquez, and Avila, were serving sentences for prior in-prison offenses or

20  assaults. Avila and Velasquez were serving life sentences.

21       85.    Upon information and belief, this incident was the third homicide by

22  inmates within a week within CDCR – all three involved inmate manufactured

23  deadly weapons, all three in so-called maximum-security prisons, and all three in a

24  recreational yard.

25       86.    The defendants in this case include high-ranking officials in the CDCR

26  including Supervisor Defendants at California State Prison, Sacramento. These

27  individuals held high positions of responsibility and oversight over the prison's

28  operations and safety protocols.

87.     The mission of CDCR and CSP-SAC is to serve the public by safely and humanely housing maximum and high-security offenders, as well as those requiring specialized mental health programming and high-risk medical concerns. However, the Plaintiff alleges that this mission was not fulfilled in the case of Decedent.

88.     The Defendants were supposed to provide protection but failed to do so with deliberate indifference to the life and safety of Decedent, rehabilitative opportunities through educational programming, vocational training, self-help programs and mental health treatment, which are supposed support an individual's transition from prison and successful reintegration back into the community.

89.     Despite CSP-SAC being a Level IV institution, Decedent and several other inmates were fatally attacked by fellow inmates, raising serious questions about the prison's adherence to its stated mission and commitment to safety.

90.     For approximately ten years prior to the incident, CSP-SAC averaged two deadly force attacks by inmates on other inmates per month and less than 1% of those deadly attacks were attempted to be stopped with deadly force despite it being authorized. Of the 452 inmate deaths in all CDCR institutions in 2018, 96.7% were male, the third most common cause of death was drug overdose, and the sixth most common cause of death was suicide or homicide. The life expectancy while in CDCR prisons for a male in 2018 was 55.9 years, as opposed to the 76.3-year life expectancy of American males in 2016. Defendants were aware of this increase in inmate violence at CDCR.

91.     In 2018, CDCR knew that the California Office of the Inspector General ("OIG") rated CSP-SAC as inadequate. Between July 1, 2017, and June 30, 2019, the OIG received 6,009 complaints of improper governmental activities. In 2018 alone, the OIG received 3,270 allegations of improper governmental activities, over 75% of which included staff misconduct and unacceptable prison conditions and operations. Allegations investigated by the OIG included but were not limited to

staff improperly rescinding sentence credits; staff failing to apply loss of credits; and staff delaying in restoring inmate credit. The OIG determined that 58% of the complaints reviewed were handled inadequately including but not limited to hiring authorities not performing inquiries; reviewers failing to conduct sufficient interviews or failing to consider all relevant information; and reviewers lacking independence or displaying bias. Disproportionately, 29% of the institutions (nearly all Level IV institutions including CSP-SAC) accounted for 54% of the allegations. CSP-SAC ranked 6/35 of CDCR'S institutions in complaints.

92.   As a direct and proximate result of the deliberate indifference, wrongful conduct, and negligence of the Defendants, Plaintiff has suffered and continues to suffer the loss of her son, resulting in Plaintiff's economic and non-economic damage in amounts to be proven at the time of trial.

93.   As a direct and proximate result of the deliberate indifference, wrongful conduct, and negligence of the Defendants, Decedent endured severe pain and suffering, loss of life, and loss of opportunity and enjoyment of life.

94.   On or about October 27, 2022, Plaintiff submitted the proper State of California Government Claim Form describing her loss. As of December 11, 2022, Plaintiff's claim was rejected by operation of law.

95.   Pursuant to 42 U.S.C. 1988(b), Plaintiff is entitled to recover reasonable attorney fees incurred herein.

## **FIRST CLAIM FOR RELIEF**

### **Failure to Protect in Violation of the Eighth Amendment**

### **(Survival Action under 42 U.S.C. §1983)**

(By Plaintiff against Individual Defendants)

96.   Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 95 of this Complaint with the same force and effect as if fully set forth herein.

97.     Defendants acted under color of state law within the course and scope of their duties to secure and manage CSP-SAC facilities when they and/or their agents deliberately allowed other inmates in the facility to physically assault Decedent.

98.     The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishments," thereby imposing numerous duties on corrections officials, including but not limited to, a duty to take reasonable measures to protect prisoners from violence at the hands of other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *Cortez v. Skol*, 776 F.3d 1046 (9th Cir. 2015).

99.     The substantial risk of serious harm posed by gang-affiliated and extremely dangerous inmates to the Decedent's health and safety under the circumstances alleged herein was known and obvious to the Defendants. Further, as alleged above, Defendants failed at every stage of Decedent's time in CSP-SAC to take reasonable measures to abate the risk Decedent faced. Instead, Defendants assigned Decedent to a yard integrated with gang-affiliated inmates; then failed to secure, safeguard, prevent and protect Decedent from attack of the inmates when Decedent stepped into that integrated yard.

100.   A reasonable officer would not have failed to perform contraband searches to ensure that gang-affiliated inmates known to be dangerous are not armed with deadly weapons when entering a yard, especially an integrated yard, especially a yard also occupied by vulnerable inmates such as Decedent. Yet Defendants acted with deliberate indifference when they failed to ensure gang-affiliated inmates were not armed with deadly weapons while in an integrated yard with Decedent as alleged herein.

101.   A reasonable agent would not have failed to properly evaluate, screen, and ensure the welfare and safety of Decedent before housing him in an integrated yard without the substantial risk of serious injury based on threats to him, individually and in the cumulative, because of Decedent case and custody factors

enumerated herein. Yet Defendants acted with deliberate indifference when they failed to property evaluate, screen, and ensure the welfare and safety of Decedent as alleged herein.

102.   A reasonable officer would not have failed to prevent gang-affiliated inmates known to be dangerous to be armed with deadly weapons when entering a yard, especially an integrated yard, especially a yard also occupied by vulnerable inmates such as Decedent. Yet Defendants acted with deliberate indifference when they failed to ensure gang-affiliated inmates were not armed with deadly weapons while in an integrated yard with Decedent as alleged herein.

103.   A reasonable officer would not have failed to search inmates for contraband to ensure that gang-affiliated inmates known to be dangerous are not armed with deadly weapons when entering a yard, especially a yard also occupied by vulnerable inmates such as Decedent. Yet Defendants acted with deliberate indifference when they failed to ensure gang-affiliated inmates were not armed with deadly weapons while in an integrated yard with Decedent as alleged herein.

104.   A reasonable officer would not have failed to prevent known gang members from conjugating together to form a plan and coordinated attack on Decedent. Yet Defendants acted with deliberate indifference when they failed to stop known gang members from forming and executing a plan to attack Decedent armed with deadly weapons while in an integrated yard as alleged herein.

105.   A reasonable officer would not have failed to have adequate tools and equipment readily available to prevent and stop an attack involving the immediate risk of death or serious bodily injury. Yet Defendants acted with deliberate indifference when they failed to ensure CDCR staff were equipped with tools and trained to properly intervene to stop the brutal deadly force used against Decedent.

106.   A reasonable officer and counselor would have simply restructured CSP-SAC Facilities to accommodate complete segregation of gang-affiliated inmates from general population inmates, which was previously instituted to protect

the vulnerable inmates from the substantial risk of harm. Instead, they integrate the dangerous gang-affiliated inmates and hope that they will follow the rules of the institutions. Yet Defendants acted with deliberate indifference when they chose to integrate vulnerable inmates such as Decedent, with dangerous inmates such as his assailants, knowing the substantial risk of harm to the vulnerable inmates by the gang-affiliated dangerous inmates.

107.   A reasonable officer in each of the Defendants' positions would have appreciated the high degree of risk that Decedent faced under the conditions they created, making the consequences of their conduct obvious. In other words, it was obvious that Decedent would be attacked and stabbed by gang affiliated-inmates because young inmates like Decedent who are being released early are known to be targeted by gang-affiliated inmates serving life sentences.

108.   Defendants knew of and were deliberately indifferent to the risk that the assailants posed to Decedent because, by not taking the reasonable available measure to abate the risk that Decedent faced, Defendants caused and/or each were a substantial factor in causing Decedent's injuries, harm, death and damages.

109.   Even in the face of such knowledge, Defendants did not take measures to stop the attack or act in any way to prevent harm to Decedent.

110.   Defendants allowed each of the four assailants to be present and armed in proximity to Decedent.

111.   Defendants did not intervene in and or protect Decedent from imminent threat of death or serious bodily injury. Instead, Defendants stood by and observed while Decedent was brutally beaten and stabbed by four assailants in plain view of several correctional officers.

112.   Defendants acted intentionally, recklessly and with deliberate indifference, subjecting Decedent to conditions that posed a substantial risk of serious harm and in fact resulted in death.

113.   As a direct and proximate result of the foregoing, Decedent was killed and died in an incredibly painful way. Losing her son, Plaintiff has sustained profound injury and damage, both economic and non-economic, as set forth herein.

114.   Defendants gave insufficient review and indeed deliberate indifference to the critical case, custody, and determinant factors of the four assailants who, as prisoners, attacked Decedent in a coordinated manner on May 6, 2022, so as to allow the integration of each of alleged assailants onto the yard at CSP-SAC where they attacked and killed Decedent.

115.   Defendants personally gave inadequate or insufficient consideration and indeed were deliberately indifferent to the critical case factors and determinants for the assailants Albert Calvillo, Irvin Rodriguez, Osbaldo Velasquez, and Jose Avila, as to allow each inmate to be in the same yard as Decedent, a vulnerable young man nearly released from prison, and when actual injuries to Decedent arose from such deliberate indifference.

116.   Improper living conditions constitute cruel and unusual punishment under the Eighth Amendment since those conditions amount to a serious deprivation of the minimal civilized measures of life's necessities. Such basic human needs include personal safety – Defendants acted with deliberate indifference to the deprivations.

117.   The conduct of the Defendants was malicious, wanton, oppressive, and accomplished with a conscious disregard for the rights of Decedent in that Decedent's constitutional rights were intentionally deprived and violated, and/or there was reckless disregard for the constitutional rights of Decedent. As such, their conduct as alleged herein entitles Decedent an award of exemplary and punitive damages from the Defendants. Plaintiff brings no action for punitive damages against Defendant CDCR or CSP-SAC.

118.   Plaintiff seeks survival damages, including Decedent's pre-death pain and suffering, loss of enjoyment and opportunity of life, and loss of life. Plaintiff also seek attorneys' fees pursuant to 42 U.S.C. § 1988 and costs of suit.

## SECOND CLAIM FOR RELIEF

**Denial of Familial Relationship, Due Process – Violation of the Fourteenth Amendment (Plaintiff's Individual Rights under 42 U.S.C. §1983)**

(By Plaintiff against Individual Defendants)

119.   Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 118 of this Complaint with the same force and effect as if fully set forth herein.

120.   The Defendants acted under the color of state law at all relevant times.

121.   "It is well established that a parent has a 'fundamental liberty interest' in 'the companionship and society of his or her child' and that '[t]he state's interference with that liberty interest without due process of law is remediable under [42 U.S.C. § ]1983.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001) (quoting *Kelson v. City of Springfield*, 767 F.2d 651, 654-55 (9th Cir. 1985)) (alterations in original).

122.   Plaintiff and Decedent had a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive her of life, liberty, or property in such a manner as to shock the conscience, including but not limited to unwarranted state interference in Plaintiff's relationship with her son, Decedent.

123.   By engaging in the foregoing conduct, the Defendants deprived Plaintiff of her right to a familial relationship with her son in such a manner as to shock the conscience, including by failing to properly ensure Decedent's most basic right to safety. This conduct violated Plaintiff's and Decedent's rights, privileges, and immunities secured by the First and Fourteenth Amendments to the United States Constitution.

124.    By engaging in the foregoing conduct, Defendants were integral participants and acted with deliberate indifference to the constitutional rights of Decedent and Plaintiff, and with the purpose to harm unrelated to any legitimate law enforcement objective. Defendants are liable to Plaintiff for the interference with their familial relationship.

125.    As a direct and proximate result of the wrongful conduct Defendants, Plaintiff suffered emotional distress, mental anguish, and pain. Plaintiff has also been deprived of the lifelong love, companionship, comfort, support, society, care, and sustenance of Decedent, and will continue to be so deprived for the remainder of her natural life.

126.    The conduct of the Defendants was malicious, wanton, oppressive, and accomplished with a conscious disregard for the rights of Decedent in that Decedent's constitutional rights were intentionally deprived and violated, and/or there was reckless disregard for the constitutional rights of Decedent. As such, their conduct as alleged herein entitles Decedent an award of exemplary and punitive damages from the Defendants. Plaintiff brings no action for punitive damages against Defendant CDCR or CSP-SAC.

127.    Plaintiff brings this claim on her own behalf and seeks wrongful death damages under this claim.

128.    Plaintiff also seeks costs and attorney's fees under this claim pursuant to 42 U.S.C. §1988.

## THIRD CLAIM FOR RELIEF

### Negligence

### (By Plaintiffs against All Defendants)

129.    Plaintiff repeats and re-alleges each and every allegation of paragraphs 1 through 128, inclusive, as if fully set forth herein.

130.    Correctional counselors, officers, and supervisors, including Defendants, have a duty to use reasonable care to prevent harm and injury to

inmates under their care and supervision. This duty includes using appropriate tactics, using ordinary care when supervising and moving inmates, using ordinary care when classifying inmates, using ordinary care in the inventorying and distribution of items that can be used as deadly weapons, using ordinary care in the supervision of inmates, using ordinary care in the movement of inmates, and using ordinary care in the supervision of especially dangerous inmates when they are placed on the same yard as vulnerable inmates. These duties also include providing proper training and equipment to officers so that they may perform their duties in accordance with the department policies, properly classify inmates, properly supervise inmates, and punish, re-train, terminate, and/or prosecute violators of those policies and the law.

131.   Defendants breached their duty of care, including in their conduct as described above. Upon information and belief, the actions and inactions of Defendants were negligent and reckless, including but not limited to:

  a.   the failure to properly and adequately classify Decedent and Assailants;

  b.   the negligent tactics and handling of the situation with Decedent, including actions before the physical attack;

  c.   the negligent failure to deter attacks on inmates, including by having properly trained and sufficient number of custodial officers on duty, and having video recordings of the yard;

  d.   the negligent failure to prevent dangerous inmates such as Assailants from being in the same yard as vulnerable inmates such as Decedent;

  e.   the negligent failure to prevent dangerous inmates such as Assailants from having access to materials used to manufacture weapons;

f.   the negligent failure to prevent dangerous inmates such as Assailants from having the ability to walk freely through the facility with inmate manufactured weapons;

g.   the negligent failure to prevent dangerous inmates such as Assailants from coordinating attacks on vulnerable inmates such as Decedent, including through the use of cell phones;

h.   the negligent scope and manner of the supervision of Decedent, an inmate known to Defendants to possess multiple critical case factors that made him particularly vulnerable to attack from gang-affiliated inmates;

i.   the negligent failure to properly train and supervise employees, both professional and non-professional, including Defendants with regard to the appropriate use of force to prevent and/or stop a life-threatening attack of a person;

j.   the negligent failure to properly train and supervise employees, both professional and non-professional, including Defendants;

k.   the negligent failure to ensure that an adequate number of employees with appropriate education and training were available to meet the needs and protect the rights of Decedent;

l.   the failure to punish, re-train, terminate, and/or prosecute violators of CDCR policies and the law.

132.   As a direct and proximate result of the Defendants' conduct as alleged above, and other undiscovered negligent conduct, the Decedent was caused to suffer severe mental and physical pain and suffering and caused him to lose his life.

133.   The Defendants are directly liable for their actions and inactions pursuant to Cal. Govt. Code § 820(a). Pursuant to Cal. Gov't Code §820(a), "a public employee is liable for injury caused by his act or omission to the same extent as a private person."

134.   A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his or her employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative." Cal. Gov't Code §815.2(a). CDCR is vicariously liable under California law and the doctrine of *respondeat superior*.

135.   Defendants CDCR and CSP-SAC are vicariously liable for the wrongful conduct of the Defendants, pursuant to section Cal. Govt. Code § 815.2(a), which provides that a public entity is liable for the injuries caused by its employees within the course and scope of their employment if the employee's act would subject him or her to liability. Pursuant to Cal. Govt. Code § 811.2, "public entity" includes the State of California, public agencies, and any of their political subdivisions in the State.

136.   Pursuant to Cal. Code. of Civ. Pro. §§377.20, 377.30, 377.34, Plaintiff brings this survival action for compensation of Decedent's pre-death pain and suffering, and disfigurement, and for punitive damages.

137.   Pursuant to Cal. Code. of Civ. Pro. §§377.60, 377.61, Plaintiff brings this wrongful death action for compensation of her past and future loss of Decedent's love, companionship, comfort, care, assistance, attention, protection, affection, society, moral support, instruction, training, advice, guidance, gifts or benefits, funeral and burial expenses, household services, and future financial support.

138.   Plaintiff seeks survival damages for Decedent's death and pain and suffering. Plaintiff also seeks wrongful death damages to for the loss of her son. Plaintiff also seeks reasonable costs and funeral and burial expenses on this claim.

139.   Plaintiff seeks attorneys' fees under this claim pursuant to Cal. Code of Civ. Pro. §1021.5 for enforcement of the important rights effecting the public

interest that Plaintiff, Decedent, and those similarly situated have to a right to familial relationship without unreasonable interference, and the right of protection.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Margarita Sanchez requests entry of judgment in his favor and against all Defendants as follows:

A.  For compensatory damages under federal and state law, in the amount to be proven at trial;

B.  For punitive damages against the individual defendants in an amount to be proven at trial;

C.  For interest;

D.  For reasonable attorneys' fees, including litigation expenses;

E.  For costs of suit; and

F.  For such further other relief as the Court may deem just, proper, and appropriate.

DATED: July 18, 2024                 **LAW OFFICES OF DALE K. GALIPO**


*/s/     Marcel F. Sincich*
Dale K. Galipo
Marcel F. Sincich
*Attorney for Plaintiff*

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury.


DATED: July 18, 2024                    **LAW OFFICES OF DALE K. GALIPO**


                                        */s/     Marcel F. Sincich*
                                        Dale K. Galipo
                                        Marcel F. Sincich
                                        *Attorney for Plaintiff*